IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION


ANDREA NICOLE VAUGHN,                          Case No. 3:15-cv-02151-YY

               Plaintiff,                          OPINION AND ORDER

     v.

COMMISSIONER OF SOCIAL SECURITY,

               Defendant.


YOU, Magistrate Judge:

## **INTRODUCTION**

      Plaintiff, Andrea Nicole Vaughn ("Vaughn"), seeks judicial review of the final decision by

the Social Security Commissioner ("Commissioner") denying her application for Disability

Insurance Benefits ("DIB") under Title II of the Social Security Act ("SSA"), 42 U.S.C. §§ 401–

33.   This court has jurisdiction to review the Commissioner's decision pursuant to 42 U.S.C.

§ 405(g) and § 1383(c)(3).   All parties have consented to allow a Magistrate Judge to enter final

orders and judgment in this case in accordance with Fed R. Civ. P. 73 and 28 U.S.C. § 636(c).

Page 1 – OPINION AND ORDER

ECF #12.   For the reasons set forth below, the Commissioner's decision is reversed and this matter is remanded pursuant to sentence four, 42 U.S.C. § 405(g), for further administrative proceedings.

## ADMINISTRATIVE HISTORY

Vaughn protectively filed for DIB on April 12, 2012, alleging a disability onset date of March 15, 2007.   Tr. 12.[1]   Her application was denied initially and on reconsideration.   Tr. 51–69.   Vaughn requested a hearing before an Administrative Law Judge ("ALJ").   Tr. 74–75.   On April 21, 2014, ALJ Riley Atkins conducted a hearing at which Vaughn, her husband, and her mother testified.   Tr. 25–49.   A vocational expert ("VE"), Robert Gaffney, also appeared at the hearing, but did not testify.   Tr. 25, 28.   The ALJ issued a decision on May 12, 2014, finding Vaughn not disabled.   Tr.   9–24.   The Appeals Council denied Vaughn's request for review. Tr. 1–4.   Because the Appeals Council denied Vaughn's request for review, the ALJ's decision is the Commissioner's final decision subject to review by this court.   20 C.F.R. §§ 404.981, 422.210.

## BACKGROUND

Born in 1971, Vaughn was 42 at the time of the hearing before the ALJ.   Tr. 120.   She has an eleventh grade education and past relevant work experience as a cosmetologist.   Tr. 135, 138. Vaughn alleges that she is unable to work due to the combined impairments of interstitial cystitis, overactive bladder, bladder spasms, anxiety, and migraine headaches.   Tr. 137.

///

///

---

[1]   Citations are to the page(s) indicated in the official transcript of the record filed on April 11, 2016 (ECF #15).

## MEDICAL RECORDS

The time period at issue in this case is from the alleged onset date, March 15, 2007, through Vaughn's date last insured, December 31, 2011.   Tr. 21, 46–47.   On March 16, 2007, Vaughn was seen in the emergency room.   Tr. 267–69.   The chart note reads in relevant part:

> Chief Complaint - ANXIETY.   It has been constant.   This started 1 week ago.   Is still present.   Has been upset (tearful).   The patient has had insomnia (difficulty falling asleep).   She has had moderate anxiety.   No anger or suicidal thoughts.   Did not attempt suicide.   Did not overdose.   She has experienced situational problems related to significant other.   The symptoms are described as moderate.   Pt c/o anxiety and headache for one week secondary to relationship problems with her ex-husband and current husband. Pt in ED with her ex-husband.   One year ago pt left her husband and got remarried.   Now she is having problems with her current husband and says he uses drugs, is unemployed, etc.   For the last month and a half she has been back with her ex-husband and now feels very stressed out because her current husband says he wants her back.   For the last week and a half she has been extremely stressed out, crying constantly, she quit her job this morning.   She denies suicidal ideation but c/o severe headache that started today.   Not eating or sleeping well.

*Id*.

Vaughn reported a past history of migraine headaches, carpal tunnel syndrome, anxiety, attention deficit disorder, and interstitial cystitis.   Tr. 267.   She was taking Adderall (for years), Ativan, and Premarin.   Tr. 268.   The doctor diagnosed an anxiety reaction and headache, and prescribed Ativan and Morphine.

About six weeks later, on May 6, 2007, Vaughn returned to the emergency room with constant dysuria and bladder pain of two days duration.   Tr. 265.   She described her symptoms as moderate and worse with urination.   Vaughn was described as anxious and in moderate distress, and was prescribed Pyridium and Norco and instructed to follow up with her urologist that week. Tr. 266.

Page 3 – OPINION AND ORDER

On October 24, 2007, Robert J. Hehn, M.D., performed a bladder cystoscopy for symptomatic interstitial cystitis with pelvic pain and frequency.    Tr. 208–23.    Dr. Hehn noted Vaughn saw Dr. Steven Lee for pain control and she took Endocet every five hours, as well as Adderall, Premarin, and Xanax.    At that time, Vaughn's "bad days" occurred more often than her "good days."    Tr. 208.    Her last bladder dilation was more than a year prior, and Vaughn thought it was time to redilate.

Dr. Hehn repeated the surgery one year later, on October 29, 2008.    Tr. 228.    Vaughn again had worsening symptoms and stated that the bladder dilations help her "for a period of time." *Id*.    Vaughn was taking Percocet 7.5 milligrams four times a day and wearing a fentanyl patch. Tr. 230.

On May 24, 2009, Vaughn established care with Thomas Hickerson, M.D.    Tr. 401–03. Dr. Hickerson noted Vaughn was on chronic pain management for interstitial cystitis with chronic hematuria.    She was on a Duragesic (fentanyl) patch "which only lasts 48 hours on her," and Endocet, six daily, as well as Xanax for anxiety and Adderall for hyperactivity.    Tr. 402.    Dr. Hickerson stated Vaughn would be seen every two weeks for pain management.    The following month Vaughn reported increased pain.    Tr. 398–99.    In July 2009 Dr. Hickerson noted Vaughn's pain medication "has done well," and in August 2009 Dr. Hickerson reported Vaughn's pain medication "seems to be working well."    Tr. 396, 394.    By September, however, Dr. Hickerson recorded increasing pain and Vaughn was scheduled for another cystoscopy which occurred in October 2009.    Tr. 389, 226.    Vaughn continued to have increased pain through October and reported on November 23, 2009 that surgery "gave her a lot of relief."    Tr. 384.

In January 2010 Dr. Hickerson changed Vaughn's Endocet to Vicodin.    Tr. 381.    The following month Vaughn reported increased migraine headaches, and in March 2010 Vaughn had

Page 4 – OPINION AND ORDER

increased stress and pain.   Tr. 376.   On June 25, 2010, Vaughn reported hematuria of four day

duration.   Tr. 368.   In September 2010 Vaughn was taking eight hydrocodone per day and

changing her fentanyl patch every 48 hours, and by October reported increased pain.   Tr. 365,

364.

On November 1, 2010, Vaughn established care with Kent C. Toland, M.D., a urologist.

Cheri Springer, Ph.D., P.A.-C., worked in Dr. Toland's practice. Dr. Springer examined Vaughn

who reported daytime urgency and frequency of every 30 minutes and nocturia times four.   Tr.

248.   The Pelvic Pain and Urinary Urgency Frequency ("PUF") Patient Symptom Scale is a

diagnostic tool to screen patients with chronic pelvic pain.   The PUF questionnaire combines a

symptom score and bother score for a total PUF score.   Scores range between 0 and 35, and a

score greater than 12 is indicative of significant symptoms. Dr. Springer noted Vaughn's PUF

score was severe at 26.   Vaughn reported bladder pain, spasm, bloating, dysuria and pain through

her pelvis.   Dr. Springer noted Vaughn was tired from lack of sleep and thin, prescribed Enablex,

Pyridium, and Lidocaine, and scheduled a cystoscopy and hydrodistention for November 15,

2010.   Tr. 250.

On November 5, 2010, Dr. Hickerson administered a chronic pain inventory in which

Vaughn reported a pain level of 5/10 continuously and 8/10 at the worst.   Tr. 360.   Vaughn stated

her pain interfered with her general activities 60% of the time, her mood 40% of the time, her

normal work (including outside the home and housework) 40% of the time, her relations with other

people 40% of the time, her ability to concentrate 50% of the time, and her appetite 50% of the

time.   *Id*.

By mid-January 2011 Vaughn reported increased pain.   In March 2011 Vaughn told Dr.

Springer that Enablex helped to moderate urgency, but she had urinary hesitation, dysuria, pelvic

Page 5 – OPINION AND ORDER

floor spasm, and pain with bladder filling.   Tr. 240.   Dr. Springer prescribed vaginal valium and Rapaflo.   On April 1, 2011, Vaughn reported her pain medications gave her 80-90% relief, with her average pain at 5/10 and most severe pain at 7/10.   Tr. 354.   By late May Vaughn reported increased bladder pain and increased sleep disruption.   Tr. 351.

Vaughn saw Dr. Springer in October 2011 with increasing bladder pain, urgency, frequency and spasm.   Tr. 238.   Dr. Springer increased Vaughn's Enablex prescription and scheduled another hydrodistention.   Tr. 238–39.   Vaughn was taking Enablex, Norco every three to four hours, a fentanyl patch every 48 hours, Adderall, Xanax, Fioricet, lidocaine, Pyridium, and valium.   On December 2, 2011, Vaughn reported pain at 4/10 aggravated by activity.   Tr. 339.   On December 5 Dr. Toland performed a urethral dilation and cystoscopy.   Tr. 235.

Vaughn saw Dr. Hickerson regularly through 2012, reporting increased low back pain in July and increased bladder pain and frequency in October.   Tr. 330, 325.   In January 2013 Vaughn told Dr. Hickerson she could not afford another surgery, and reported to Dr. Springer increased nocturia up to ten times per night with a flare and normally five to six times per night. Tr. 322, 283.   Dr. Springer prescribed Bladder ease.

On February 28, 2013, Dr. Springer noted Vaughn "receives significant improvement" from periodic hydrodistention and wanted another surgery.   Tr. 294.   Dr. Springer said Vaughn received a reduction in bladder symptoms for several months after the procedure that allowed her to function at "a bit higher level but even this leaves her with significant baseline symptoms."   *Id*. Vaughn's symptoms had increased for several months, she was unable to concentrate and required help with cooking and cleaning.   Her sleep was disrupted with pain greater than 7/10 daily.   She spent hours a day on the toilet.   Vaughn had been unable to afford Enablex for several months and had urinary frequency of every ten minutes.   Dr. Springer noted Vaughn previously worked as a

Page 6 – OPINION AND ORDER

cosmetologist but had to retire early due to her medical condition.   Vaughn had another urethral

dilation surgery on March 18, 2013.   The following month Vaughn reported hourly urinary

urgency and frequency, with baseline pain of 5/10 "but she is able to function at this level."   Tr.

286.   Dr. Hickerson saw Vaughn through 2013, with increased pain in December.   Tr. 303.

On January 14, 2014, Vaughn returned to Dr. Springer requesting another surgery.   Tr.

279.   Dr. Springer noted Vaughn's deteriorating symptoms, and that Vaughn typically wore sweat

pants to avoid putting pressure on her lower abdomen.   Vaughn had trouble eating due to severe

pain, and Vaughn's mother brought her meals.   She had constant urgency despite Enablex and

was unable to make social plans because she could not predict how she would feel.   Vaughn was

unable to complete any household chores even on a good day, and during a flare her urinary

frequency was 25–30 times with hourly nocturia.   Her pain level ranged from seven to ten.   Dr.

Springer wrote that Vaughn was "suffering with end state IC," assessed her prognosis as "poor,"

and explained that, patients at this stage "experience daily elevated pain levels, have poor quality

of life and low levels of functioning.   The pain at this stage has been compared to that of cancer

pain in the literature and the quality of life comparable to that of kidney dialysis."   Tr. 281.   Dr.

Springer noted there is no cure for the condition, and Vaughn had financial barriers to additional

treatments, including the implantation of an Interstim device to stimulate the sacral nerves with

mild electrical pulses.   Vaughn reported increased pain to Dr. Hickerson in February, and had

another surgery on March 20, 2014.   Tr. 298.

In April 2014, Dr. Springer wrote to the ALJ stating Vaughn had been a patient at the

practice since November 2010 for treatment of interstitial cystitis.   Tr. 768–69.   Dr. Springer

stated interstitial cystitis flares and recedes over time, and with progression patients experience

baseline symptoms that feel similar to a urinary tract infection.   She opined that Vaughn had

Page 7 – OPINION AND ORDER

severe and constant daily pain affecting her ability to concentrate, and took medication with cognitive effects.   Tr. 769.   Dr. Springer stated Vaughn would "certainly" average more than two days per month in which she would be absent from work, and that this had been the case since she was first seen by Dr. Springer in November 2010.

In June 2014 Dr. Springer reviewed the ALJ's decision denying Vaughn's application for disability benefits, and wrote a second letter to the ALJ repeating her opinion as to Vaughn's condition, citing her own doctoral dissertation research on the effect of anxiety on a patient's PUF score, pain levels and other indictors of severity of disease.   Tr. 770–71.   Dr. Springer completed and submitted to the ALJ a Medical Source Statement in which she assessed multiple severe and disabling limitations.   Tr. 772–75.

## DISABILITY ANALYSIS

Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected   to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).   The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act.   20 C.F.R. § 404.1520;   *Tackett v. Apfel*, 180 F.3d 1094, 1098–99 (9th Cir. 1999).

At step one, the ALJ determines if the claimant is performing substantial gainful activity. If so, the claimant is not disabled.   20 C.F.R. § 404.1520(a)(4)(i) & (b).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the 12-month durational requirement. 20 C.F.R. § 404.1520(a)(4)(ii)&(c).   Absent a severe impairment, the claimant is not disabled.   Id.

Page 8 – OPINION AND ORDER

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations. 20 C.F.R. § 404.1520(a)(4)(iii) & (d); 20 C.F.R. Pt. 404 Subpt. P, App. 1 (Listing of Impairments). If the impairment is determined to meet or equal a listed impairment, the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC"). The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite the limitations imposed by his or her impairments. 20 C.F.R. § 404.1520(e); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv) & (e). If the claimant cannot perform past relevant work, then at step five, the ALJ must determine if the claimant can perform other work in the national economy. *Bowen v. Yuckert*, 482 U.S. 137, 142 (1987); *Tackett*, 180 F.3d at 1099; 20 C.F.R. § 404.1520(a)(4)(v) & (g).

The initial burden of establishing disability rests upon the claimant. *Tackett*, 180 F.3d at 1098. If the process reaches step five, the burden shifts to the Commissioner to show that jobs exist in the national economy within the claimant's RFC. *Id*. If the Commissioner meets this burden, then the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(v) & (g).

## **ALJ'S FINDINGS**

At step one, the ALJ concluded that Vaughn had not engaged in substantial gainful activity since her alleged onset date of March 15, 2007, through her date last insured of December 31, 2011. Tr. 14.

Page 9 – OPINION AND ORDER

At step two, the ALJ determined that Vaughn has the severe impairments of interstitial cystitis.  Id.  The ALJ also determined that Vaughn's mental impairments of anxiety and attention deficit hyperactivity disorder did not cause more than minimal limitations in Vaughn's ability to perform basic work activities and were therefore non-severe.  *Id*.

At step three, the ALJ concluded that Vaughn does not have an impairment or combination of impairments that meets or equals any of the listed impairments.  Tr. 15.  The ALJ found that Vaughn retained the RFC to perform the full range of sedentary work.  Tr. 16.

At step four, the ALJ determined that Vaughn had been unable to perform her onset date of March 15, 2007, to her date last insured of December 31, 2001, because the demands of working as a cosmetologist exceeded work at the sedentary level.  Tr. 18.

At step five, the ALJ found that considering Vaughn's age, education, and RFC, a finding of not disabled is directed by Medical-Vocational Rule 201.25.  Tr. 19.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record.  See 42 U.S.C. § 405(g); *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).   This court must weigh the evidence that supports and detracts from the ALJ's conclusion.  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citing *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998)).   The reviewing court may not substitute its judgment for that of the Commissioner.  *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F.3d 1194, 1205 (9th Cir. 2008) (citing *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007)); *see also Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001).   Where the evidence is susceptible to more than one rational interpretation, the Commissioner's decision must be upheld if it is "supported by inferences reasonably drawn from the record.'" *Tommasetti v.*

*Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (quoting *Batson v. Comm'r of Soc. Sec. Admin.*, 359

F.3d 1190, 1193 (9th Cir. 2004)); *see also Lingenfelter*, 504 F.3d at 1035.

<u>**FINDINGS**</u>

Vaughn contends the ALJ erred by: (1) improperly finding her testimony less than fully

credible; and (3) failing to credit the opinion of Dr. Springer.

On November 5, 2002, the Commissioner issued SSR 02-2P, providing a framework for

evaluation of interstitial cystitis ("IC").   According to the Commissioner, "IC is a complex,

chronic bladder disorder characterized by urinary frequency, urinary urgency, and pelvic pain."

SSR 02-2P, 2002 WL 32063799 (Nov. 5, 2002) ("Titles II and XVI: Evaluation of Interstitial

Cystitis").   Additionally, "response to treatment is variable, and some individuals may have

symptoms that are intractable to the current treatments available.   Treatment may include bladder

distention; bladder instillation; oral drugs, . . . antidepressants, antihistamines, and narcotic

analgesics; and the use of transcutaneous electrical nerve stimulation.   *Id* at *1.

**I.   <u>Rejection of Claimant's Testimony</u>**

**A.   <u>Legal Standard</u>**

The Ninth Circuit has developed a two-step process for evaluating the claimant's

testimony about the severity and limiting effect of his or her symptoms.   *Vasquez v. Astrue*, 572

F.3d 586, 591 (9th Cir. 2009).   First, the ALJ "must determine whether the claimant has presented

objective medical evidence of an underlying impairment which could reasonably be expected to

produce the pain or other symptoms alleged."   *Lingenfelter*, 504 F.3d at 1036.   When doing so,

the claimant "need not show that her impairment could reasonably be expected to cause the

severity of the symptom she has alleged; she need only show that it could reasonably have caused

some degree of the symptom."   *Smolen v. Chater*,   80 F.3d 1273, 1282 (9th Cir. 1996).

Page 11 – OPINION AND ORDER

Second, "if the claimant meets the first test, and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'" *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1281).   It is "not sufficient for the ALJ to make only general findings; he must state which pain testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill v. Shalala*,12 F.3d 915, 918 (9th Cir. 1993).   Those reasons must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (citing *Bunnell v. Sullivan*, 947 F.2d 341, 345–46 (9th Cir. 1991)(*en banc*)).

For the past year, a new SSR has governed assessment of a claimant's subjective symptom testimony. *See* SSR 16-3p, 2016 WL 1119029 (March 16, 2016).   SSR 16-3p eliminates the reference to "credibility," clarifies that "subjective symptom evaluation is not an examination of an individual's character," and requires the ALJ to consider all of the evidence in an individual's record when evaluating the intensity and persistence of symptoms. *Id*. at *1–2.   The ALJ is directed to examine "the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id*. at *4.   Considerations include:   (1) the claimant's statements made to the Commissioner, medical providers, and others regarding the claimant's location, frequency, and duration of symptoms, the impact of the symptoms on daily living activities, factors that precipitate and aggravate symptoms, medications and treatments used, and other methods used to alleviate symptoms; (2) medical source opinions, statements, and medical reports regarding the claimant's history, treatment, responses to treatment, prior work

Page 12 – OPINION AND ORDER

record, efforts to work, daily activities, and other information concerning the intensity,

persistence, and limiting effects of an individual's symptoms; and (3) non-medical source

statements, considering how consistent those statements are with the claimant's statements about

his or her symptoms and other evidence in the file.   *Id*. at *6–7.

The ALJ's assessment of a claimant's subjective symptoms may be upheld overall even if

not all of the ALJ's reasons for rejecting the claimant's testimony are upheld.   *See Batson*, 359

F.3d at 1197.   The ALJ may not, however, discount a claimant's subjective testimony "solely

because" it "is not substantiated affirmatively by objective medical evidence."   *Robbins v. Soc.*

*Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006) (citations omitted).

### B.   <u>Vaughn's Testimony</u>

Vaughn testified that her symptoms progressively worsened, with her interstitial cystitis

"flares" becoming more frequent and debilitating between 2007 and 2011.   In 2007, she had

"isolated flares" two or three times per week and still managed to keep her job.   Tr. 31.

However, by 2011, she was experiencing 10–15 "bad days" per month, meaning she would have

the urge to urinate and a sense of urgency 15–20 times during the day.   Tr. 32–33.   On "good

days" she would have to urinate seven or eight times during the day.   Tr. 32.   When her bladder

was bothering her on "bad days," she would have to take "all the medicines," lie down, and put a

heating pad between her legs.   Tr. 35.   At that time, her prescribed medications included a

Duragesic patch (narcotic pain medication), Adderall (for ADHD), Xanax (anti-anxiety

medication), Fioricet (for migraines), a suprapubically applied Lidoderm patch (local anesthetic),

and pyridium (pain reliever affecting lower part of urinary tract).   Tr. 36, 655.   She was having

"significant pelvic floor issues" that were "contributing to [a] voiding disfunction," prompting Dr.

Springer to add vaginal valium and Rapaflo to Vaughn's medication list.   Tr. 655.   During the

Page 13 – OPINION AND ORDER

night, Vaughn would get up eight or ten times due to spasms.   *Id.*   The lack of unbroken sleep made her irritable and unable to focus during the day.   Tr. 35–36.

Approximately annually since the mid-1990's, Vaughn has undergone cystoscopy, bladder dilation, and bladder instillation procedures.   *See* Tr. 226–27 (November 4, 2009) and 243–44 (November 15, 2010).   On December 5, 2011, Vaughn underwent those same procedures, as well as urethral dilation apparently necessitated due to the formation of scar tissue from these repeat surgeries.   Tr. 235–36.   These procedures are performed in a hospital under general anesthesia, require several weeks of recovery, and in most cases are accompanied by several weeks of elevated bladder pain and increased voiding symptoms.   Tr. 770.

Vaughn testified that it would take her four or five days to recover from the bladder dilation procedures and about a month before she would notice any effects.   Tr. 36-37.   Her flares would then reduce somewhat, but over the next eight months her flares would again increase until they were constant and she would need a repeat procedure.   Tr. 37-38.   Vaughn described her "pain cycle" involving her interstitial cystitis, anxiety, and migraines as "feeling terrible," leading to anxiety, being "all tense" because her bladder hurt so badly, causing her "whole body" to be tense, leading to a migraine.   Tr. 39.

### C.   <u>ALJ's Findings</u>

The ALJ found Vaughn "partially credible."   Tr. 18.   The ALJ gave two reasons for discrediting Vaughn's testimony.   First, he alluded to a discrepancy between testimony by Vaughn and a medical chart note, finding an inconsistency as to the reason Vaughn quit her job. Tr. 18.   However, Vaughn did not testify in the manner the ALJ claims, nor does the medical chart note provide the causal link that the ALJ implies.   The ALJ states that Vaughn "testified that in 2007, she had isolated flares of pain two to four times per week, but her condition deteriorated

Page 14 – OPINION AND ORDER

requiring her to quit her job."  Tr. 18.   However, Vaughn did not testify about the reasons she

quit her job.   Tr. 25–49.   Instead, Vaughn testified that in 2007, she would have an "isolated

flare, maybe [a] couple times a week, three, four times a week."   Tr. 31.   Moreover, Vaughn

indicated in her DIB application that she quit working due to her conditions.   Tr. 137.

The ALJ also cites a March 16, 2007, emergency room record at which Vaughn sought

treatment for anxiety and insomnia.   Vaughn described stress arising from relationships with her

current and ex-husband, and the doctor noted "[f]or the last week and a half she has been extremely

stressed out, crying constantly, she quit her job this morning."   Tr. 267.   That note, however,

does not say anything about why Vaughn quit her job.   The focus of the emergency room

treatment was on the psychological crisis Vaughn was then experiencing and says nearly nothing

about her longstanding struggles with interstitial cystitis.   Vaughn's statements do not conflict,

and therefore the purported conflict is not a clear and convincing reason to discredit her testimony

about her symptoms and the limitations imposed by her impairments.

The ALJ also found Vaughn's testimony less than fully credible because "the objective

medical evidence in the record does not support the claimant's allegations of extreme impairment

from March of 2007 through the date last insured in December of 2011."   Tr. 18.   The record, as

summarized above, indicates considerable treatment, including five surgical procedures and twice

monthly monitoring of a fentanyl patch and opioids.   The ALJ's determination that Vaughn's

testimony is not supported by the objective medical evidence is not supported by substantial

evidence.   Moreover, the ALJ's general statement does not meet the Ninth Circuit's "specificity"

requirement, which mandates that "'[g]eneral findings are insufficient; rather the ALJ must

identify what testimony is not credible and what evidence undermines the claimant's complaints.'"

*Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) (quoting *Lester v. Chater*, 81 F.3d 821, 834

Page 15 – OPINION AND ORDER

(9th Cir. 1995)).   This court "may not . . . comb the administrative record to find specific

conflicts."   *Id.*   In sum, neither of the reasons proffered by the ALJ for discrediting Vaughn's

testimony pass muster.   Accordingly, this court rejects the Commissioner's decision to discount

Vaughn's testimony.

## II.   Treating Provider's Opinion

### A.   Legal Standard

Acceptable medical sources are medical or osteopathic doctors, licensed or certified

psychologists, licensed optometrists, licensed podiatrists and qualified speech-language

pathologists.   20 C.F.R. § 404.1513.   As a physician's assistant, Dr. Springer is an "other" source

who may provide observations to help determine a claimant's limitations.   20 C.F.R.

§ 404.1513(d); SSR 06-3p, 2006 WL 2329939 (August 9, 2006).   "Other source" evidence, such

as that from a physician's assistant, may be rejected by offering a reason that is "germane" to the

opinion.   *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

### B.   Dr. Springer's Opinion

Dr. Springer, who treated Vaughn beginning November 10, 2010, authored two letters to

the Commissioner, one just prior to the hearing before the ALJ (Tr. 768–69) and one a month after

the ALJ's decision (Tr. 770–71).   In the first of those letters, Dr. Springer notes Vaughn's 1999

diagnosis and recounts the constellation of symptoms associated with interstitial cystitis:

> IC is a condition characterized by painful urination, extreme urinary
> urgency, frequency, bladder and pelvic pain, and painful intercourse
> among other symptoms.   There is no known cure for IC and the
> condition is progressive.   The pain associated with IC has been
> compared to that of cancer pain in the literature and quality of life
> among patients with end stage IC has been compared to that of
> kidney dialysis patients.   The nature of the condition is to flare and
> recede over time.

Tr. 768.

Dr. Springer then recounted the severity of Vaughn's IC, and opined on her likely work

absences as a result of her symptoms:

> [Vaughn] already had longstanding, severe IC when she established
> with our office.   Although she had a treatment regimen in place that
> provided her with some temporary symptom reduction from her
> most severe pain, this does not change the fact that she does have
> severe and persistent IC resulting in significant effects.

Tr. 769.

### C.  ALJ's Findings

The ALJ purported to give Dr. Springer's opinion "some weight," but then observed that

"the observations of Dr. Springer include [Vaughn's] condition both before and after her date last

insured, and it is unclear what Dr. Springer's opinion regarding the claimant's functionality was

during the time frame prior to her date last insured in 2011."   Tr. 17.   These observations provide

no basis to discount Dr. Springer's opinion.

First, a lengthy treatment record is not a reason to reject the opinions of a treatment

provider.   To the contrary, among other considerations, the length of a treatment relationship

strengthens rather than weakens the import of a treating provider's opinion:

> Generally, the longer a treating source has treated you and the more
> times you have been seen by a treating source, the more weight we
> will give the source's medical opinion.   When the treating source
> has seen you a number of times and long enough to have obtained a
> longitudinal picture of your impairment, we will give the source's
> opinion more weight than we would give it if it were from a
> nontreating source.

20 C.F.R. § 404.1527(c)(2)(i).

Second, Dr. Springer's opinion regarding Vaughn's functionality prior to December 31,

2011, was not "unclear" in the least.   Dr. Springer stated:

Page 17 – OPINION AND ORDER

> In terms of disability, I feel confident that over any period of several months she would certainly average more than two days per month in which she would be absent from work.   I would say this has been the case since she was first seen in November 2010 and her condition has further deteriorated since that time.

Tr. 769; *see also* Tr. 770.

The ALJ rejected Dr. Springer's opinion as unsupported "by the urology records prior to the date last insured, and the treatment notes penned by Dr. Hickerson, the claimant's treating physician (Exh. 8F; 9F; 10F)."   Tr. 17.   Those three exhibits span almost 500 pages of the 776 page administrative record.   As Vaughn points out, the ALJ's reference to almost 500 pages of medical records is not specific.   Moreover, as set out above and as detailed by Dr. Springer following her review of the ALJ's decision (Tr. 770–71), those records support Dr. Springer's opinion.

In sum, this court concludes that the ALJ erred in rejecting Dr. Springer's opinion about the functional limitations imposed as a result of Vaughn's interstitial cystitis prior to her date last insured.

## III.  Remand

The ALJ provided inadequate reasons for rejecting Vaughn's testimony about her symptoms and subjective pain and for rejecting the opinion of Dr. Springer.   As noted earlier, the ALJ relied on Medical-Vocational Rule 201.25 to find Vaughn not disabled. Tr. 19.   "At step five a vocational expert's testimony is required when a non-exertional limitation is '"sufficiently severe" so as to significantly limit the range of work permitted by the claimant's exertional limitation.'"   *Hoopai v. Astrue*, 499 F.3d 1071, 1076 (9th Cir. 2007) (quoting *Burkhart v. Bowen*, 856 F.2d 1335, 1340 (9th Cir. 1988)).

Page 18 – OPINION AND ORDER

When fully credited, Vaughn's testimony and Dr. Springer's opinion indicate that, well prior to Vaughn's date last insured of December 31, 2011, her interstitial cystitis and other impairments imposed nonexertional limitations significantly impairing her ability to perform the full range of sedentary work.   Although a VE attended the April 21, 2014 hearing, he did not testify, leaving a gap in the record as to whether the limitations identified in Vaughn's testimony and Dr. Springer's opinion would preclude competitive employment.

The Commissioner must consider the claimant's ability to perform work on a regular and continuing basis, which "means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8P, 1996 WL 374184 at *1.   The "adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.* 8 hours a day, for 5 days a week, or an equivalent work schedule)."   *Id*. at *7.   In cases involving transitory or intermittent, but substantially incapacitating, impairments, the "ultimate question . . . is whether [claimant's] sporadic incapacity prevents [the claimant] from performing any substantial gainful activity within the meaning of the Social Security Act."   *Totten v. Califano*, 624 F.2d 10, 12 (4th Cir. 1980).   Additionally, "the capability to work only a few hours per day does not constitute the ability to engage in substantial gainful activity[.]"   *Rodriguez v. Bowen*, 876 F.2d 759, 763 (9th Cir. 1989) (citing *Kornock v. Harris*, 648 F.2d 525, 527 (9th Cir. 1980)).

In her testimony, Vaughn described the cycle of annual bladder dilations and associated procedures she has been undergoing since the mid-1990's.   Shortly after those surgeries, her symptoms increase and, within about eight months, she is suffering from unremitting flaring.   Tr. 37-38.   Vaughn's testimony about her history of "good days" and "bad days" is fully consistent with Dr. Springer's description of the progressive and "severe" nature of Vaughn's IC, and her ongoing baseline symptoms predating her date last insured.   Tr. 768-69.   This court is

Page 19 – OPINION AND ORDER

hard-pressed to conclude that, when properly credited, Vaughn's testimony and Dr. Springer's opinion would result in anything other than a finding that Vaughn was disabled prior to her date last insured.   In a case involving a claimant with symptoms mirroring those endured by Vaughn, a federal judge in Arizona so found.   *Szarka v. Colvin*, 2016 WL 393641 (D. Ariz. Feb. 2, 2016). However, the conclusion in *Szarka* was supported by the testimony of a VE to the effect that the claimant's need for bathroom breaks would preclude competitive employment.   *Id* at *3.   This court is not at liberty to step into the shoes of the VE and—perhaps recognizing the limitations of the court's role—Vaughn does not seek remand for an award of benefits.   This court concludes that the record lacks the necessary supportive testimony from a VE and, therefore, concludes that remand for further proceedings is the proper course of action.

## **ORDER**

This matter is remanded pursuant to sentence four, 42 U.S.C. 405(g) for further proceedings in accordance with this Opinion and Order.   On remand, the Commissioner shall: (1) reassess Vaughn's RFC, giving due consideration to her testimony, the opinions of Dr. Springer, and the guidance of SSR 02-2P; and (2) as necessary, obtain VE testimony to make an appropriate step five finding.

IT IS SO ORDERED.

Dated this 29th day of March, 2017.

/s/ Youlee Yim You

_____

Youlee Yim You
United States Magistrate Judge

Page 20 – OPINION AND ORDER